Good morning. May it please the court, Judge Bivey, Judge Graper, Judge Christin. My name is Bernie Bervar. I represent defendant, appellate, federal police officer Anthony Vasquez. I would like to, we have 15 minutes per side, I'm going to take 10 minutes of it, my co-counsel is going to take five, and I would like to reserve two minutes for rebuttal. The district court erred in denying qualified immunity to Officer Vasquez because his actions in this case were reasonable. And even if they were not reasonable, the law was not so clearly established at the time. And again, the date of the violation or the offense in this case, or the date of the arrest was June 29, 2009. So in looking at whether qualified immunity should be granted, there's a two-step analysis. First, were constitutional rights violated? And secondly, was the constitutional right clearly established, clearly established by case law? Counsel, forgive me for interrupting. I wonder, Judge Graber, would you mind if we just give one extra minute so counsel can give a really quick fact pattern for the students? Sure. This might help the students understand the context. Sure. This happened out in Kalailoa, Kapolei, former This was about approximately 2 o'clock in the morning. Officer Vasquez was patrolling the area, and he observed a car parked in the middle of the road with his lights off, and then the car turned its lights on and proceeded past Officer Vasquez the other way. Officer Vasquez decided to investigate and began following the vehicle, came up behind the vehicle, which was traveling very slowly at the time, only 10-15 miles an hour, and noticed that the vehicle had an expired safety check, which is required in the state of Hawaii for a valid license. Officer Vasquez then illuminated his blue lights to pull over the vehicle, and the vehicle didn't stop. It kept going, albeit at 10 miles an hour. We had a slow speed pursuit, which lasted approximately about 2 1⁄2 miles, taking about 15 minutes, all the time Officer Vasquez was behind Mr. Cordero's vehicle. Another vehicle, police vehicle, comes on the scene. He was called to the scene, and that is Officer Cortez. As Officer Vasquez is following Mr. Cordero, Mr. Cortez's police vehicle comes the other way, and at that point, Mr. Cordero finally pulls over to the side of the road. Officer Vasquez and Officer Cortez both get out of their police vehicles and demand that Cordero get out of the car. He refused to get out of his car. He was seen grabbing some item in the car, apparently a cell phone, that he was making a phone call with. He refused the officer's commands. Counsel, in looking at the facts, though, for purposes of this appeal, we have to look at from the like-most favorable to the plaintiff. Correct. So, according to him, he sat completely calmly with his arms or hands crossed, and also, according to him, Officer Vasquez pointed a loaded weapon at him for about two minutes at his face, and then the other officers sprayed him with pepper and then they put handcuffs on him that were extremely painful and declined to loosen them, declined to wipe his face. So, why aren't those facts sufficient to get this case to a jury? Well, because Officer Vasquez's conduct was reasonable in light of the circumstances Mr. Cordero had refused to pull over for the police vehicle. But he didn't physically threaten anyone. He didn't try to restart his car. And we have case law that says that merely refusing to comply with commands, if there's no threat involved, no immediate threat, doesn't justify the use of as much force as was used here. If there's no immediate threat, and we look at, I think, the Whitewaters case, our political protesters with their arms locked together, where the officers put the pepper spray on with q-tips. Obviously, those people are not a threat. Cordero, out here in the middle of the night, in his car, the officers don't know what's in the car. The keys are in the ignition, which is a fact that I think the district court... But he didn't make any move to restart the car, according to his testimony. He sat with his arms crossed. According to his testimony, yes. And we have to take that as true, don't we, for this purpose? For purposes of this, yes. So where is it permissible to take someone who's sitting like this... Asking for the police to be called. And point a loaded gun at his head. Well, at this point, he has refused to pull over for Officer Vasquez for approximately 15 minutes. So right there, let's stop if we could, because that's a fact mentioned repeatedly in your briefs. This is not a high-speed chase, quite the contrary. Sometimes the high-speed chase itself is a danger to the public or a danger to others. But in this case, in this very remote area, this individual slowed down to, I think, something like 5 or 10 miles an hour. He says 10 miles an hour. Right? Right. So it seems to me that that's just the opposite of threatening, right? But he makes no gesture or... Well, we've got testimony he made some gestures, but according to his testimony, he makes no signal or gesture to the police officer that he's complying, that he's going to pull over, that he's just trying to get to a safe area. He just keeps going. His testimony, which we have to accept as true, is that he saw these lights behind him. Didn't know... They thought it was teenagers initially. Somebody was zooming up behind him, I think rapidly. He thought whatever he thought, but he slowed down. And then when he saw the other lights coming towards him that he could see was a police vehicle that he pulled over. Is that... Do I have that wrong? Yeah. That's when he says he sees Officer Cortez's car with its badge on. He sees Officer Cortez with his badge and his uniform, and then he realizes these are two police officers, and he still doesn't get out of the car. He doesn't put his hands up to indicate, look, I'm not a threat. But he crosses his arms, according to his testimony. According to him, after he starts grabbing things in the car, what he says is a cell phone. How did the uniforms differ from Honolulu Police Department? These weren't police officers with the Honolulu Police Department, correct? They were not Honolulu Police officers. They're federal police officers, but they are police uniforms with badges. They're like a blue... And do they routinely enforce expired safety checks? They do on federal property, yes. Was this on federal property? It began on federal property, and where he finally pulled over was federal property. Now, during the course of the two and a half mile low speed chase, they went in and out of federal property, but we would submit that where he actually pulled over was federal property. I've taken you afield a bit, but back to where Judge Graber was. When your client approached the car, he did what? What do you think the uncontested facts are? Officer Vasquez told him to get out of the car, and he wouldn't get out of the car, and he just says, call HPD. Didn't he ask, why are you stopping me? Why are you pulling me over? Yeah, that's what he says. He says, why are you stopping? Why are you pulling me over? But I think his testimony is that rather than... I think what one would expect is asked to see the driver's license, asked to see the vehicle registration, and my understanding is none of that was done here. Is that right? Just an immediate command to get out of the car. Is that right? Right, right. After following him for 15 minutes, and again, you know, Officer Vasquez's testimony, should we get to trial, and this will be very different from what Mr. Cordero says he did. It's the summary judgment standard. How long did that go on with demand to get out of the car? How long did that go on before the gun was drawn? It went on for, I would say, it's unclear from Mr. Cordero's testimony that we're taking here, but there were commands to get out of the car probably for a minute or so when he didn't do it, and I think it was when Mr. Cordero picked up the cell phone, which Officer Vasquez wouldn't know if that's a weapon or what it is, that he would have drawn the weapon. So, you know, I think Mr. Cordero, you know, escalated the situation here by continuing to refuse. He, again, he refused to stop, but assuming he's driving to a well-lit area, once he sees the other... Is it your view of that mere refusal to follow the instructions without any accompanying threat would justify the amount of force that was used here? Well, no, I think the case law says otherwise. Okay, so from taking the plaintiff's testimony as true, what else happened other than he didn't get out of the car? From taking the testimony in the light most favorable to him, isn't that really all that he did wrong, quote-unquote, is that he didn't get out of the car? He didn't get out of the car. He didn't show his hands. He starts fumbling with things in the car. Was he, forgive me for interrupting, but was he told to show his hands? How did he not comply? According to his testimony, he was not told to show his hands. He was told to get out of the car. Okay, so the non-compliance was, forgive me for interrupting, but is, am I, do I have it right that the non-compliance was failing to get out of the car? Failing to get out of the car, and actually somewhat belligerent, just sitting back, you know, like, call HPD. Well, that goes back to Judge Graber's point about sitting with his arms crossed. To me, that did seem uncontested in the record, that he was sitting, asking to have the HPD called, which is not a comment I would expect from someone who's trying to evade police, and that's why I'm really, it's true, it's, I'm not trying to be flip, I'm trying to make sure I haven't missed anything else that he was doing. Well, that's according to his testimony. Well, that's, and that's, this is summary judgment to take, that he's sitting in the car telling, call HPD, and then apparently he says he's got the gun pointed to his head, and he's just saying, oh, are you going to shoot me? You're going to lose your job tomorrow. I mean, that question, you know, whether that's conduct someone would actually do in that situation. Let's suppose, let's suppose that the police were entitled to pepper spray him and to handcuff him. What would justify not loosening the handcuffs when he told them that they hurt? And what would justify not allowing him a handkerchief, a Kleenex, something to wipe the pepper spray out of his eyes over a prolonged period once he's been subdued? Justifying not giving him a handkerchief or wiping the pepper spray out, there's, you know, there's no testimony in the record on this, but there, you know, we believe there is testimony that the officers are trained to wait for EMT because they're not medical technicians to take care of the pepper spray, and that actually wiping it can make it worse, or water can make it worse. But they're sufficiently technical that they can loosen the handcuffs? The handcuffs issue, yes. The handcuffs, if he's under control and he's not struggling, then what they're trained to do is to put the handcuffs on, and when he's under control, they put the fingers in and make sure that, you know, they're not too tight. Did they testify that they did that? There's no testimony in the record. So they didn't testify that they did that, and he testified that they hurt, and that they hurt for a couple of weeks afterwards. Right. So why isn't that, why wouldn't that alone be sufficient to send this to a jury? You might have narrowed the issues, but... I would concede of the three issues, the point of the pepper spray and the point of the gun, I believe he's entitled to qualified immunity. I would concede that, you know, the record on the handcuffs alone requires a good fact on that. Okay. So you have to go back to a jury on that question, at least. I would concede that issue, that one alone would be a jury issue. And I see I'm out of time. Yeah. Did you want to give some time to co-counsel? Good morning, Your Honor. Mason Martin, and I represent Dependent Wesley Cortez. He's the officer that pulled up second on this incident. I will just take a minute or two, because that's all I believe I'm allowed right now. But just from my client's perspective, you know, he was called to the scene. When he showed up, it was undisputed that he was in uniform. He was in a police car. The conduct of my client was clearly reasonable. He showed up in a situation where there's one police officer, one person in a defensive posture, not getting out of the vehicle when he pepper sprayed him. Mr. Cordero, that's a very defensive posture. He's in Afghanistan right now, and I've served with him in the Air National Guard. He is not complying with this arrest. I also want to point out that Mr. Cordero, he escalated the situation. It's 2 in the morning. He testified he'd left a party. He's in a very secluded area of Hawaii going 10 miles an hour. He's followed for 15 minutes on federal property that he can be on from his privilege of serving in the military. He refuses to pull over. And when my client comes up, he comes to a situation where there's a person in a vehicle who's escalated the situation, who's refused to get out, who's sitting in a defensive posture, and these are police officers that have to make a split-second reaction. They can't see into the vehicle. They don't know what's underneath him, and my client pepper sprays him while he still has the keys in his ignition. I believe Mr. Brevard has laid out the facts of that, but those are the issues. Mr. Brevard has also conceded that at least with respect to the handcuffs, that question has to go to the jury. I would disagree on the handcuffs. You disagree with counsel on that one? I would disagree with that. Okay, why not? People from personal experience many years ago, when you're handcuffed, they do hurt. That happens. So they're always going to hurt? People who testify, they always would hurt. I mean, handcuffs are being restrained. Are they trained to put two fingers between them to make sure that they're not too tight? There's no testimony to that, but they are trained to put two fingers. You can also double handcuff to make it looser, but most times, officers, when they're handcuffed, there's going to be some pressure on that because you're restraining someone. You know, you're not just asking them to go to the back of a police car. Right, but you can be restrained in such a way that you're not mobile without hurting somebody. Correct, and some people who are handcuffed, and we've done this, you know, when we restrain people and do our briefings. I mean, certain people will bruise, certain people won't bruise. That is just part of having a metal handcuff, but I don't think there's anything out of the ordinary. So even though he's testified that they were too tight and that he requested that they be loosened, that's not sufficient to go to a jury on a question of... I don't believe so. I mean, what would he have to say about the handcuffs in order to get to a jury? Well, the handcuffs, I mean, if he was bleeding, he was cut into them, there was medical evidence that they might have severed an artery. That is clearly too tight. Severing an artery? Surely you don't mean they have to sever an artery before... No, I don't, but I'm just saying that we're very close to a slipping line of what handcuffs are too tight and what handcuffs would be too loose. You just made a representation that this happened on federal property. Correct. Their testimony from my client said it started on federal property and ended on HPD jurisdiction. There's testimony from the plaintiff's and from Mr. Brevard's client, or Mr. Brevard's client's testimony, it started on federal property and Estoppel is on federal property. But not entirely on federal property, that's what you just said. Correct. That's what my client said. It's an important fact, it seems to me, because part of plaintiff's case here has to do with him not complying, he said, and asking for HPD to come because he understood that these folks were out of their jurisdiction. Correct, according to his testimony. Which is what we need to take for the Summer Judgment Center. Okay, thank you. Thank you, and we will give you some, your two minutes for rebuttal because we asked you to elaborate, so thank you for that. May it please the court, Joseph Rosenbaum here on behalf of Christopher Cordero, plaintiff and Epali, also at table with counsel is Elizabeth Jubin-Fujiwara. Judges, I'd first like to clarify the factual record. Defense counsel stated, as was just discussed, that this started out on federal jurisdiction. It is uncontroverted, and in fact, defendant Cordero admitted during his deposition that this was on HPD jurisdiction. Basically, what occurred on June 29, 2009, is that at 2 in the morning or thereafter, after Mr. Cordero was fishing, he left from the beach area. They didn't know he was fishing. Correct. They knew he was out there at 2 in the morning, right? And 15 minutes is a long time not to comply with the police officer's signal to pull over. What's your response to that? The response is in the record, Your Honor. There is nothing. You can look back at the totality of the record. There is nothing in the record from either of the defendants that Mr. Cordero was fleeing, and in fact, Mr. Cordero states that he was never fleeing. My question is different, so let me ask it again. Sure. They say it was 15 minutes, according to the uncontested facts, 15 minutes before your client pulled over. I've already made it clear that I understand that he was going 10 miles an hour. That's a long time. My question is, what's your response? Why didn't he pull over for 15 minutes? He didn't pull over for 15 minutes because, first of all, there's nothing in the record that it was 15 minutes. They're arguing it was 15 minutes. There is zero in the record. So that's your response. Correct. The second response is the reason why he didn't pull over is because he's in a very dark and secluded area of this island. He was trying to drive, and this is in the record, to a shopping mall so that he could be in a place where there's lights. Let me explain one thing. Yes. We've read the record, so I think that's important to just be really clear. We're familiar with the record. You think there isn't anything in the record that says that it was 15 minutes before he pulled over. What does he say about what he could see in his rearview mirror? What he could see in his rearview mirror was a pickup truck that approached his car extremely fast to the point where he could not even see the license plate of the pickup truck behind him. It then slowed down. It did that again, came up to very close behind his car. At that point, it turned on the lights. At that point, he noticed it was a black pickup truck, no markings on the pickup truck. It was not HPD. He knew he was on HPD jurisdiction, so he believed that these were either adolescents messing around, or he had heard on at least three occasions there were people impersonating police officers in this exact area. There had been people pulled over by people impersonating cops, and they had been assaulted. What do the lights look like? The lights are blue lights, your honor. Thank you. So basically, he was traveling in that area. All he wanted to do was get to a place where he could be around other people, or there would have been lights. The police procedure states that the police themselves are supposed to take anybody they're pulling over to a place that is well lit, not only for the suspect's protection, but for the protection of the police. I imagine their response to that would be that it's not always possible to get to a well-lit area. In this instance, it was. Well, it depends. It depends on the reasonableness of allowing this to go on for 15 minutes. Right. And I would disagree that it was 15 minutes. And again, as I stated, there's nothing in the record that states that this was 15 minutes, your honor. So he's moving to a place where he could feel like he was secure or protected, not knowing that these were actually police officers. Do we know how far he traveled? We don't know exactly how far he traveled. The shopping center that he was traveling to was two and a half miles from the place where he was. And he said he was going 10 miles an hour. Correct. Now that's 15 minutes, right? If I do my math right. If you're doing your math correct, then I would agree. So 15 minutes may not be explicit testimony that it was 15 minutes, but that would be what the math suggests. Assuming that he actually made it to the shopping mall, but he did not make it to the shopping mall. The shopping mall is two and a half miles away, but he didn't make it there. So it's sometime before the 15 minutes, maybe half of the 15 minutes. I'm not exactly sure. And there's no testimony as to that. Counsel, you've mentioned that this happened after your client had been fishing and that what he wanted to do is to get to the well-lighted area and get to the shopping center and whatnot. From whose perspective do we look at this? The reasonable officer. So they didn't necessarily know that, right? No. That's going to be their argument when they come back to the podium. And I'm just trying to give you a fair chance to respond to it now. Sure. But a reasonable officer is a well-trained officer, we're assuming. A well-trained officer should have known their own policies that if a person is traveling at 10 miles an hour, and again, in the record, they never state, neither of the officers state that they thought that he was fleeing. In their depositions, they didn't state that he was fleeing. There's nothing in the record before this court that he was fleeing. So they should have known when he's traveling 10 miles an hour and he doesn't change his speed, he doesn't make any evasive movements, he does not do anything that a reasonable officer would have thought that this man was fleeing. And if a reasonable officer would have thought this, clearly they would have testified. Sure, but he's being evasive because he's not stopping when he was instructed to stop by officers. Right. So it may be evasive and he's ignoring an order even though he's not accelerating. Correct. I would agree with you. What about, if you could fast forward, what about the scene once they're stopped and one of the defendants approached the vehicle and what about that? He's non-compliant, right? He didn't get out of the car. Well, can we take one step back? When he's being pulled over, he's being pulled over for a safety check. Yes, he didn't stop and he was being evasive on some level for not stopping. When Officer Vasquez got out of his car and immediately and aggressively ran up to Mr. Cordero's car, he yelled at him to get out of the car and get on the ground. He never asked for his safety check information, his license. He never identified himself as a police officer and Mr. Cordero knew that he was not in correct jurisdiction to be taking the actions the officer was taking. But again, opposing counsel is going to get up and tell me it was clear to your client that he was a police officer at that point because he was in uniform, right? Correct. Okay. So it wasn't really necessary for him to identify himself as a police officer, was it? No, but I would figure that he would have taken the normal procedures of asking for driver's license and safety check violation. So then he refuses, and the case law is clear, Your Honor, as was already indicated, that passive resistance in refusing to comply with an order of a police officer does not raise the situation to a level whereby you can use an intermediate or high level of force as was used here. What about the Brooks case? The Brooks case, there was, the Brooks case, first of all, they found that there was a constitutional violation. In the Brooks case, there was a level of resistance that you do not find here, irregardless of what the court found. There was no resistance here. Taking plaintiff's story as correct, there was no resistance whatsoever besides a passive resistance of saying, I will not get out of the car. Noncompliance. Right. Please call HPD. And to clarify the factual record as compared to what defense counsel stated, he said, please call HPD multiple times. Then he picked up his phone to call HPD, and Officer Vasquez tells him to put down your phone. There's no question that Officer Vasquez knew this was a phone, that he had the phone in his hand, and that he said, Cordero said, I want to call HPD to have them see this. And he put the phone down when Vasquez told him to. That's a point in the record that bears some discussion, I think, because I think by your concession, they're in a dark area. They didn't make it to the shopping center. It's a dark area. And so it's one thing to be sitting with your hands folded, arms folded, with a police officer there, and quite another to be reaching for something, reaching for the cell phone, because we're so concerned about, the law is so concerned about officer safety. My understanding from opposing counsel is that that's the point at which the gun was pointed. What's your response, please? That is completely incorrect. There's nothing in the record that states that. The record, in taking Cordero's testimony as the facts that we must look at at this point in the case, he had already picked up his phone to call HPD. Officer Vasquez says, put the phone down. He puts the phone down. Officer Vasquez then repeats, get out of the car, get out of the car. You're not complying, get out of the car. At that point, there is a passive resistance with the non-compliance. At that point, he draws his weapon and puts it to Mr. Cordero's head. The phone was already down. There's no evidence whatsoever in the record that Mr. Cordero's fleeing at that point. He was actively resisting at that point. He was making any threats at that point. Nothing. So at the time that Mr. Cordero had put down his phone, and again, he was asked to get out of the car and he refused, the gun was drawn. The timing of it shows that there was no threat. They want to say that his hands are in the car. He could have grabbed anything. Well, anybody that's pulled over could have ever done that. So anybody that's pulled over, because they could have grabbed something in the car that the officer didn't know was there, even though the officer has no objective reason to believe that there's a weapon or that there's any threat whatsoever, that they have a right to draw their weapon and put it to the head of Mr. Cordero, a level of force that is high by all of the case law. It's completely unreasonable. So next, Officer Cortez comes and Officer Vasquez tells him to spray Mr. Cordero with his mace. He sprays him with the mace, not once, but twice. They drag Mr. Cordero out of the car, throw him on the ground, handcuff him to the point where it leaves bruises on his wrist, and in the record are the pictures of the bruises. For two and a half weeks, these bruises lasted. Even looking at the Sixth Circuit, where the standard is much higher, that states the plaintiff must state that he asked the officers to loosen the cuffs, and they did not. That is a standard in the Sixth Circuit, which is higher than in our circuit. He did every one of those things. He asked the officers, can you loosen the cuffs? They didn't. He asked the officers, can you please wipe the mace out of my eyes? They did not. It's clear that they allowed him to suffer in pain when he was already in custody and on the ground. There's no reasonable explanation for why this occurred. It is so beyond my understanding that officers would do this to an individual when there is no need for this sort of force. The need arises from a violation of a safety check. Further, defense testified that, there's nothing in the record to this, but he testified that it would be worse for Mr. Cordero if he wiped the mace out of his eyes or if he put water in it. It's clear that it's police procedure to wash the mace out of somebody's eyes once they do it, let alone give them a rag. The police officers testified that they didn't even have a rag to wipe his eyes in their car. They had nothing to wipe his eyes with. Further, it's police procedure, just as argued by defense counsel, and this was in the record by both officers, that they're supposed to put two fingers, just like Judge Bybee had suggested, two fingers between the handcuff and the wrist. This is supposed to be checked when they put the cuffs on. They didn't do anything like that. The officers had testified that that is the police procedure that they were supposed to do. They did this in excess. The force was not necessary at that point, and there's no testimony whatsoever that Plaintiff Cordero was ever a threat. In fact, Officer Cortez admits during his deposition that the plaintiff was never a threat, a physical threat or a threat as a criminal. Again, I'll reiterate that there was no testimony whatsoever that the officers themselves believed that Plaintiff Cordero was fleeing from them. Unless the panel has further questions, I will rest. I don't believe that we do. Thank you. Thank you. You may have two minutes for rebuttal. Thank you. Just briefly, the 15 minutes came from basically the basic math, 10 miles an hour, and he said he was going to a but that's where I get the 15 minutes. What about the description of the sequence of events vis-a-vis pulling the gun and the plaintiff reaching for a cell phone? What's your version of events about that sequence, please? It's unclear from the record here, but according to Mr. Cordero, when Officer Vasquez gets out of the car, he approaches the vehicle, tells him to get out of the car almost simultaneously, I believe is what he says, with pulling the weapon. And at the same time, Mr. Cordero, it's almost simultaneously Mr. Cordero grabbing his cell phone. Again, after he didn't obey, get out of the car, get out of the car, get out of the car. He's pulling the gun when he's not getting out of the vehicle. Yes, but when I asked you earlier about that, I think even your version of events is that it was about a minute before the gun was pulled, only about a minute. Is that right? I would say yes. And with respect to the description of the little pickup trucks, but they're blue and white with a full light bar across the top. This couldn't be confused as a kid with, you know, he's got one little blue light. These are fully light bars. And again, the standard is a reasonable officer. And I would agree with my co-counsel that sitting there with their arms crossed is a defensive position. And from that they don't know whether he's got a weapon, whether he's hiding a weapon. Right. But if you've got your arms crossed, it's not likely that you're going to be able to draw something like that. You know, you can, you can pull it. Did they ask him to show his hands? I thought we had, I thought we had understood, established that they did not ask him to show his hands. They told him to get out of the car. Okay. But there's lots of different ways of the, you can show the hands, you can ask them to put his hands back on the wheel where they can see him. They could have asked, they could, yeah, they could have asked that, but they, they told him to get out of the car. They could have asked him to do jumping jacks, but it just doesn't seem like that would have been sort of necessary under those circumstances in order to secure their safety. They're asking him to get out of the car in order to secure his safety. But he takes this action to hide his hands rather than to say, hey, call HPD, call HPD. Look, I got nothing. But he also had his cell phone out. So that, that required use of the hands so they could see that he didn't have a weapon in the hands. He had a cell phone and they knew it was a cell phone. At that point, yes. Right. And then I wanted to address, I mean, I think the Brooks case is instructive. In the Brooks case, they found a Fourth Amendment violation that found qualified immunity because the law was not clearly established. Now that case was decided after this case happened. You know, the Brooks case, you've got a pregnant woman dropping her kid off at school, being pulled over for either speeding or a seat belt violation. And when she refuses to sign the ticket, they arrest her under the Seattle code. You can arrest for that. And she gets upset and says, no, I'm not going to get out of the car to be arrested. You know, I'm pregnant. And they sit there and dial up how, talk about, debate how, how hard should we tase her? Should we dial it up to eight or seven good enough? I mean, obviously there's no threat in the Brooks case. And that obvious no threat is not present in this case. At two o'clock in the long, low speed pursuit where Mr. Cordero's not obeying or not listening, not doing anything that the officers asked. Thank you, counsel. The case just argued is submitted and we appreciate the arguments of all three counsel.
judges: Graber, Bybee, Christen